### In re LOUIS J. BERGDOLL MOTOR CO.

(District Court, E. D. Pennsylvania. January 22, 1916.)

#### No. 4742.

BANKRUPTCY ⚖➡341—CLAIMS—IMPLIED CONTRACTS—LIABILITY FOR LABOR AND MATERIALS.

The bankrupt was a dealer in automobiles manufactured by a corporation formed to take over the manufacturing part of the business formerly conducted by the bankrupt. The claimant was a manufacturer of automobile accessories and represented itself to have designed an electric starter. The bankrupt thought well of this starter, and advertised that such starter would be used on its cars, though the starter was then defective and in an experimental stage. As the substitution of another starter would have been a source of embarrassment, efforts were made to get the starter into shape, and finally a sample was furnished the bankrupt, and a written agreement was executed in the form of a contract for the sale of 750 starters at a specified price. The claimant at that time, however, had no faith in the starter and no thought of making starters of that description, and continued to direct its energies towards designing a satisfactory starter. It submitted a blueprint of a new starter, which would have involved changes in the make of the automobile, and negotiations, correspondence, and conferences continued for some time, during all of which time the bankrupt was insistently calling for starters. Nothing was ever done towards construction beyond the experimental ex-

pense to which the claimant was subjected, and the referee, treating the contract as lacking a subject-matter and mutually abandoned, allowed the claimant for the work and materials supplied in its experimenting on a quantum meruit basis. *Held*, that this was as favorable to the claimant as it had any right to expect, and came nearer to doing justice than any other award, though the bankrupt's liability at all was not beyond doubt.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 516, 528; Dec. Dig. ☞341.]

In Bankruptcy. In the matter of the Louis J. Bergdoll Motor Company, bankrupt. On petitions for review of an order of the referee. Referee's order modified, and petitions dismissed.

See, also, 225 Fed. 87.

Sidney E. Smith, of Philadelphia, Pa., for claimant.
Joseph W. Catharine, of Philadelphia, Pa., for trustee.

DICKINSON, District Judge. It is extremely difficult to so analyze the transactions between the parties concerned in these reviews as to enable any one to evolve an intelligible theory of the claimant's case or the bankrupt's defense. The transaction can be best characterized as a muddle. It is almost impossible to find a starting point. If we start with the claim as presented, we have this view of the situation of the parties. The claimant agreed to supply and the bankrupt to take 750 starters for automobiles at the agreed price of $175 each. The deliveries were to be made at the rate of 25 per month, beginning in November, 1912. None of the starters was actually supplied. Each party to the contract accuses the other of its breach. The only possible view to be taken of the legal rights of the parties to the contract suggested by this statement of the case and the defense is that the rights of each turn upon the finding of which was responsible for the breach and award damages accordingly.

It is difficult to take this view in favor of the claimant, because of the obstruction presented by the fact that no breach on the part of the bankrupt is set up until February, 1913, after the claimant had been in default for two months' deliveries. The solution of the problem suggested by these facts is in turn also rendered difficult of acceptance by the raising of the question whether the default in performance of the contract by the claimant was not due to the acts of the bankrupt. The way out of the muddle found by the referee seems to have been in effect to disregard the contract as one lacking in the essential element of having a subject-matter, or as having been mutually abandoned by the parties, and referring their respective rights and responsibilities to the test of those arising out of transactions which in effect were that the claimant did certain work and supplied materials at the request of the bankrupt without any agreement as to compensation or price (except a $175 sample starter), and, in consequence, to be paid for on a quantum meruit basis. He has accordingly awarded the claimant the sum of $15,672.33.

The correctness of the figures of the award is not very loudly challenged, except that the amount should be reduced by $2,000, the admitted value of certain materials included, but which the claimant re-

tained and used for its own purposes. The referee has found the above-stated sum after making the deduction, but apparently this is an error and the sum found by him should be reduced to $13,672.33, as the $2,000 was intended to be deducted, but was seemingly overlooked. The figures found by the referee differ slightly from the proofs, but no point is made of this difference. In the view we have, taken of the case this finding is quite as favorable to the claimant as it had any right to expect, and its complaint that it should have been awarded a larger sum is without merit. The trustee takes the position that nothing should have been awarded the claimant. To make clear the basis for the award made by the referee a statement of facts at some length is necessary.

The bankrupt was incorporated for the purpose, and at first carried on the business, of a manufacturer of and dealer in automobiles. Subsequently its manufacturing department was given up, and that part of its plant sold, and another corporation was formed for the purpose and in fact took over the manufacturing part of the business which had been conducted by the bankrupt. This second corporation is known as Bergdoll Machine Company. Thereafter these corporations dealt with each other as entirely independent business concerns. The bankrupt confined its activities to the sale of automobiles, which were made for it by the Bergdoll Machine Company and others. The Bergdoll Machine Company manufactured for the bankrupt and others. As the same persons were largely interested in both companies, the business relations were closer and more trustful than they doubtless would otherwise have been, and for all practical purposes the manufacturing work was in fact done much as it would have been done if done by a manufacturing department of the bankrupt's business. The claimant is in the business of supplying specialties. It designs and makes parts and accessories of cars. It represented itself to have designed and to have ready for use an electric starter to be applied to automobiles. The bankrupt heard of the claimant's starter and thought well of it. The automobile sales business has its seasons. The season of 1913 really began in September, 1912. Its 1913 model of cars was required to be supplied to its customers within a reasonable time after the car was ordered. It was not to be expected that any one would buy until he had first seen the type of car he was purchasing. Much preliminary work was, in consequence, necessary to prepare for the work of the salesman. The particular car to be put out during the season must be advertised and exploited by means of the usual sales literature. To be described it must have been previously designed and contracts placed for constructing it in all its parts. This included the starter used on the car.

The bankrupt and the claimant were moved by like impulses to get together. The bankrupt wished to secure the use of claimant's starter. They had a common interest in advertising it as a feature of bankrupt's make of car. The starter had at least one defect. It was liable to become inoperative when the car was run at low speed. This defect the claimant thought could be overcome. The automobile season opened too soon to afford time to perfect the starter. Before it had

been fully tried out the bankrupt put out its literature. In this the car was exploited as equipped with this particular make of starter. With an optimism which charitably may perhaps be deemed excusable in an advertiser, the starter was described as one which had been selected after the most exhaustive and thorough-going trial tests. These tests had proved the starter to be the very best, and, because it was the best, had been adopted and incorporated in the Bergdoll car. The real fact was that the starter was still in the experimental stage, and its advertised merits belonged to the realm of prophecy rather than history. The efforts to whip the starter into shape lasted through the summer of 1912. By June the bankrupt had given up all hope of being supplied with starters and decided to adopt another make. The substitution of another in place of the one of which so much had been made was a source of embarrassment. The bankrupt was hence easily led into a renewal of its hope of getting this starter. The efforts to get it into shape were renewed, and were continued well into the autumn. Finally a sample starter was brought into being and supplied to the bankrupt. The automobile company was already behind time in having its advertised car ready for inspection and show. Everybody concerned in having the season's business a success became anxious and clamorous for cars to be turned out. As a result the sample starter was declared by the bankrupt to be acceptable, and the parties were in accord as to the price and the minimum number of starters to be taken by the bankrupt. This readiness of the parties to agree was on October 10, 1912. A written agreement was then drawn up and executed about October 24 or 26, 1912. It was antedated October 10, 1912. By its terms it called for the sale and purchase of at least 750 starters at the price of $175, each to be delivered from time to time during the several months following. The contract followed the printed form in use by the claimant with certain changes. The contract in form contemplated the sale of an existing or at least a known thing of standard make. There was in fact no such thing, and no description or specification of what the thing to be manufactured was, unless the sample starter is written into the contract.

The necessities of the bankrupt induced it to believe the sample starter to be a starter which would answer its purposes. The claimant, however, as the referee finds and as is the undoubted fact, had no faith in the starter as it was, and no thought of making starters of that description. In consequence of this attitude, nothing was done toward manufacturing any special make of starter, but the whole energy of claimant was directed toward designing another type of starter. The first thing it did was to submit a blueprint of the new starter. The change involved changes in the make of the automobile, and prolonged negotiations were begun and protracted correspondence and conferences were entered into in the effort to design a make of starter which would meet the bankrupt's needs. This went on until February, 1913, when, a change of management in the Motor Company having taken place, the negotiations were definitely broken off. During the whole period the bankrupt was insistently and almost frantically calling for starters, and the claimant was replying with

requests to have an agreement reached as to dimensions of parts, type of clutch, and other details of construction, and, later, for a machine to test and try out the starters. In the end nothing was done toward construction beyond the experimental expense outlay to which the claimant was subjected. The business consequence to each company was disastrous, and insolvency can be certainly and directly, if not wholly, traced to these transactions as the cause. Nothing but evidence of turmoil and an interminable tangle can be found by delving into the particulars of these transactions. These broad facts do, however, stand out in clear relief. There was no contract worthy of the name in the sense of an express contract. The written agreement bearing date October 10, 1912, is really nothing more than an expression of good faith on the part of the parties in the expression of what each was willing to do. The transaction in substance was this:

The claimant had designed a starter which, if used on cars which were run at a high speed, was a good starter. Its defect was that, if the car was operated at such low speed as it might be if run by a timid or even cautious driver, the starter would not work. Both parties wished to deal with each other, and there was a common belief the defect in the starter could be overcome. Dallying with this hope the bankrupt tied its make of car to the use of this starter. Its whole season's business was gone unless the starter could be used. The parties collaborated to produce a successful starter. The bankrupt believed it had been found in the sample starter. The claimant knew it had not as yet been found, but still believed it would be. The parties, therefore, agreed upon the price and deliveries, but not upon the starter. The bankrupt expected to receive the sample starter. The claimant expected to furnish an as yet unfound starter which would be acceptable to the automobile company. The bankrupt was in such urgent need of some starter that it would have accepted any which could have been made to answer the purpose. It was willing to make any changes in its car which would aid in producing results. The claimant never had a thought of making the sample starters under the contract. It never made any preparations to carry out that contract, and was never in a position to have done so. It could not do so, for the very sufficient reason that it had not found the starter which was to be made by it and used by the bankrupt. Whatever contract there was between the parties was, so far as affects their present rights, an implied contract. Its substance was the direction in effect, if not in words, of the bankrupt to the claimant:

"Go ahead and make starters for us, and for whatever your labors are fairly worth and whatever your reasonable expenses are we will pay you."

In other words, it was the same as if they had done the work in a department of their own plant. The only difference was that in case starters had been constructed the obligations of the parties would have been translated into the terms of a sale and purchase at the agreed price and for the agreed minimum number. That the bankrupt assumed liability for the expense of the experimental work is by no means beyond doubt; but the referee, after a most patient hearing and exhaustive inquiry, has so found, and we do not feel justi-

fied in disturbing this finding. This conclusion is accompanied with the feeling that no other award than that made by the referee would come nearer to doing justice to the parties. Neither of them stood, or indeed has a right to stand, on its strict legal rights growing out of any express contractual relations, because no such standing ground can be found without shutting our eyes to the presence of unjust consequences.

The findings of the referee are approved, and the order made allowed, except the amount thereof is reduced to $13,672.33, and the petitions for review are each and both dismissed.